UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HITACHI ASTEMO INDIANA, INC., | ) |
| Plaintiff, | ) |
| v. | ) No. 1:20-cv-01345-JPH-TAB |
| XPO LOGISTICS, LLC, | ) |
| Defendant. | ) |
| XPO LOGISTICS, LLC, | ) |
| Counter Claimant, | ) |
| v. | ) |
| HITACHI ASTEMO INDIANA, INC., | ) |
| Counter Defendant. | ) |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Hitachi Astemo Indiana hired XPO Logistics in 2017 to manage logistics for Hitachi's shipments. Hitachi filed this lawsuit in April 2020, alleging that XPO charged far more than their agreement allowed through the end of their relationship in September 2019. Hitachi has filed a motion for partial summary judgment on liability. Dkt. [57]. For the reasons below, that motion is **DENIED**.

# I.
# Facts and Background

Because Hitachi has moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

In 2017, Hitachi—at the time named Keihin North America—decided to hire a logistics company to manage its shipments. *See* dkt. 58-3 at 28–31. Hitachi asked for bids with pricing estimates based on the CzarLite 1999[1] tariff. *See id.* at 26. In the shipping industry, tariffs are standard base rates used to calculate transport prices. *See* dkt. 63-1 at 17 (Manning Dep. at 33). A freight-logistics company like XPO would tell carriers the tariff's base rate for a certain origin and destination, and the carrier would then offer a discount. *Id.*

XPO initially used the CzarLite 1999 tariff in its bid as Hitachi requested and gave price estimates on June 23, 2017, using a CzarLite 1999 base rate and 83% discount. Dkt. 58-3 at 25, 54. By August 16, 2017, Hitachi was moving forward with XPO and working toward a contract. *Id.* at 107–10. But XPO learned near the end of August that its sister company, XPO LTL, had not used CzarLite 1999 rates in its pricing estimates for Hitachi's less-than-load ("LTL") shipments. *Id.* at 56–58 (emails between XPO and XPO LTL employees). At the rates that XPO initially gave Hitachi, XPO LTL would've operated "at a

---

[1] This rate is also referred to as Czar 1999, Czar 99, Czar 1-1-99, and CzarLite 1-1-99.

significant loss," *id.* at 56, so XPO told Hitachi on August 28, 2017 that its initial CzarLite 1999 estimates were invalid.  *See* dkt. 63-3 at 68–72.

At Hitachi's request, dkt. 63-5 at 2, XPO submitted additional rate estimates on September 1, 2017, repeating that the CzarLite 1999 rates were "null and void," dkt. 58-5 at 7.  The additional rates were not final because they didn't reflect "customer specific negotiated rates" that XPO could get after a formal request for pricing ("RFP").  Dkt. 63-6 at 2; *see* dkt. 58-5 at 7.

Hitachi agreed to hire XPO, and they finalized their agreement on September 25, 2017.  Dkt. 58-3 at 1–21 (Agreement); dkt. 58-1 at 4.  The Agreement outlined XPO's freight-management responsibilities and required XPO to "[v]erify, audit, and pay correct Services Provider charges, invoices and freight bills for those carriers contracted with XPO and/or transporting Customer's Commodities."  Dkt. 58-3 at 1–2.  The Agreement then addressed "pricing/payment of invoices":

> a. In full consideration of the Services to be provided by XPO . . . [Hitachi] agrees to pay XPO the rates set forth in the [Statement of Work ("SOW").
>
> b. XPO shall submit invoices to [Hitachi] for amounts due XPO based upon the provisions of the SOW, and [Hitachi] shall pay each invoice in accordance with the terms and conditions of this Agreement. . . .

*Id.* at 3.  The SOW referred to in the Agreement was attached as Appendix A and provided more details about pricing and invoicing:

> LTL carrier pricing for [Hitachi's] LTL shipments shall be based on CzarLite 1-1-99 rate base."
> . . .

3

> XPO will process, audit, make payment, and handle all inquiries on Service Provider invoices that are handled on and after the effective date.
>
> [Hitachi] will pay all transportation costs, fuel surcharges and accessorial charges as invoiced by the Services Providers in the case of LTL services . . . .[2]

*Id.* at 14–16. The Agreement did not specify a discount rate from the CzarLite 1999 base rates. *See* dkt. 58-3 at 1–21.

XPO provided logistics services to Hitachi until the agreement terminated on September 25, 2019. Dkt. 58-1 at 5.

Hitachi filed this case in April 2020 in Indiana state court, alleging that XPO breached the Agreement by failing to invoice Hitachi as the Agreement required. Dkt. 1-2. In the alternative, Hitachi alleges unjust enrichment and money had and received. *Id.* at 6–8. XPO removed the case to this Court in May 2020, dkt. 1, and filed counterclaims for breach of contract and, alternatively, unjust enrichment, dkt. 30.

Hitachi seeks partial summary judgment, arguing that there is no triable issue of fact on liability for its breach-of-contract claim, XPO's mutual-mistake affirmative defense, and XPO's counterclaims. Dkt. 57.

## II.
## Applicable Law

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[2] The SOW later repeats: "Costs: [Hitachi] will pay all transportation costs, fuel surcharges and accessorial charges as invoiced by the Service Providers to XPO." Dkt. 58-3 at 16.

4

judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). Indiana substantive law governs this case. *See Webber v. Butner*, 923 F.3d 479, 480–81 (7th Cir. 2019).

### III.
### Analysis

Hitachi moves for summary judgment on (1) liability on its breach-of-contact claim, (2) XPO's affirmative defense of mutual mistake, and (3) XPO's counterclaims for breach of contract and unjust enrichment. Dkt. 59 at 20–21. The Court must apply Indiana law by doing its "best to predict how the Indiana Supreme Court would decide" the substantive issues. *Webber*, 923 F.3d at 482.

Hitachi bases its summary-judgment arguments on the Agreement's provision that "LTL carrier pricing for [Hitachi's] LTL shipments shall be based on CzarLite 1-1-99 rate base." Dkt. 59 at 22 (citing dkt. 58-3 at 15). XPO responds that summary judgment is inappropriate because there is a triable

issue of fact about whether it was required to use CzarLite 1999 pricing with an 83% discount.  Dkt. 64 at 22.  XPO also contends that the CzarLite 1999 provision resulted from a mutual mistake in the drafting process.  *Id.*

A mutual mistake in a contract may be corrected by reforming the contract "if there has been a meeting of the minds [and] an agreement actually entered into, but the document in its written form does not express what the parties actually intended."  *Beneficial Fin. I Inc. v. Hatton*, 998 N.E.2d 232, 236 (Ind. Ct. App. 2013).  Hitachi argues that it's entitled to summary judgment on this issue because "[Hitachi], at all times, required pricing to be from the CzarLite [1999] tariff."  Dkt. 59 at 24.  XPO responds that there is a triable issue of fact on mutual mistake because the evidence allows a reasonable factfinder to decide that the parties moved away from the CzarLite 1999 rates during their negotiations.  *See* dkt. 64 at 10–11.

Hitachi initially requested bids from XPO based on CzarLite 1999 rates so that it could "compare apples to apples since this specific tariff was the requirement for the other freight vendors [Hitachi has] been speaking with."  Dkt. 58-3 at 26 (email from Hitachi to XPO).  XPO followed that request in its first pricing estimates.  Dkt. 58-3 at 24–25 (XPO email replying that it "did submit cost estimates based on the Czar 99 rate base").

But after XPO realized and told Hitachi about its profitability concerns with its initial CzarLite 1999 quote, *see* dkt. 58-3 at 54–56, both parties moved away from CzarLite 1999 toward estimates based on other tariffs.  *See* dkt. 58-5 at 3.  Hitachi told XPO that it "would like to see how the ConWay 599 and

Czarlite 99 [rates] compare in the linehaul rate." Dkt. 63-5 at 2. XPO responded that it was working on it, and that it was "working on executing an LTL RFP" that would get specific rates from carriers. *Id.* A subsequent XPO internal email said that Hitachi and XPO had an "agreed to plan [ ] to utilize the XPO 599 rates until an LTL FRP is completed." Dkt. 63-3 at 68. A few days later, XPO sent Hitachi a comparison of "rate estimates representative of" pricing based on CzarLite 1999 and Conway 599 rates. Dkt. 58-5 at 7. XPO added that "[a]s you are aware, the XPO LTL removed the Czar99 rates [so] their CZAR 99 rate estimates are null and void." *Id.*

Those revised pricing estimates were higher than Hitachi wanted, leading to a call between XPO and Hitachi that Hitachi summarized in an internal email that shows the refocusing away from a specific tariff and toward a total weekly cost:



**Christine Lanoue**

| | |
|---|---|
| From: | Julie Schuyler |
| Sent: | Tuesday, September 5, 2017 12:13 PM |
| To: | Samuel Hauser |
| Cc: | Josh McMahan; Christina Morog |
| Subject: | XPO LTL |

Sam,
Just spoke with Greg Canon. He said that the new "blanket" pricing he provided was not customer specific negotiated rates. These are rates that carriers provide to them for spot runs. He knows that when they do the RFP they will get better pricing. I explained to him that we are going to be subject to a $7k ($17k to $24k) cost increase per week until the RFP is complete and operating. I challenged him to get to $20k/week. I explained that if they can get to $20k/week then this doesn't have to go higher than my level. If they can't then I have to tell my boss and we will be back to square one with quoting everything out again. I gave him a lot of incentive to get to $20k/week. He's going to try to get an answer from the pricing group by tomorrow.

KEIHIN

Julie Schuyler
Supply Chain Manager
Keihin North America, Inc.
Cell: (317)498-9922

Dkt. 63-6 at 2.

This evidence shows that both Hitachi and XPO focused less on the CzarLite 1999 rates as they moved closer to an agreement. XPO has also designated evidence that its RFP eventually resulted in using the CzarLite 2000 rate base. Dkt. 58-3 at 122–23. Moreover, XPO met with a Hitachi representative, who was "overall satisfied with everything" except some "past billing/invoicing/rating issues" that he did not believe would be an ongoing problem. *Id.* This evidence of the parties' practices is relevant to whether they made a mutual mistake. *See Hatton*, 998 N.E.2d at 236 ("In determining the intent of the parties, courts must look to the parties' conduct during the course of the contract.").

That is not to say that the Agreement necessarily included the language about CzarLite 1999 rates by mistake. In fact, Hitachi has designated evidence that without a commitment to CzarLite 1999 rates, XPO "would not have won" Hitachi's business. Dkt. 58-1 at 3. But at this summary-judgment stage, the record as a whole—including evidence of the parties' negotiations and practices—must be viewed in XPO's favor. With that lens, the designated evidence allows a reasonable factfinder to conclude that the Agreement included the language about CzarLite 1999 rates by mistake.[3]

---

[3] As Hitachi argues, the mutual mistake must be proven by clear and convincing evidence at trial. *Meyer v. Marine Builders, Inc.*, 797 N.E.2d 760, 771–72 (Ind. Ct. App. 2003). The Indiana Court of Appeals has held that this heightened standard does not apply at summary judgment, *id.* at 771–72, while the Indiana Supreme Court has implied that it does, *Carlson v. Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos*, 895 N.E.2d 1191, 1200–01 (Ind. 2008). The Court does not resolve this question

If XPO prevails on its mutual mistake defense, the Agreement can be reformed to remove its provision requiring that XPO use LTL pricing based on CzarLite 1999 rates. *See Meyer v. Marine Builders, Inc.*, 797 N.E.2d 760, 773–74 (Ind. Ct. App. 2003); *Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 356 (Ind. Ct. App. 1995) ("The primary purpose of reformation is to effectuate the common intentions of the parties to the instrument which were incorrectly reduced to writing."). Because that provision is central to the parties' disputes about the Agreement, Hitachi is not entitled to summary judgment on its breach-of-contract claim or on XPO's breach-of-contract counterclaim. Similarly, Hitachi is not entitled to summary judgment on XPO's unjust-enrichment counterclaim because Hitachi's argument relies on the Agreement's provision requiring the use of CzarLite 1999 rates. Dkt. 59 at 29–30.

## IV. Conclusion

Hitachi's motion for summary judgment is **DENIED**. Dkt. [57]. XPO's motion to exclude the testimony of Hitachi's proposed expert D. Shawn Shaw remains pending. *See* dkt. 72.

This case is set for a bench trial beginning January 23, 2023. Dkt. 76. Magistrate Judge Baker is asked to hold a settlement conference to discuss settlement and trial readiness.

**SO ORDERED.**

---

because, with all factual disputes resolved in XPO's favor, a reasonable factfinder could find a mutual mistake by clear and convincing evidence.

9

Date: 3/31/2022

                                              *James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Tracy Nicole Betz
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
tbetz@taftlaw.com

Christopher Lee Bills
FROST BROWN TODD LLC (Indianapolis)
cbills@fbtlaw.com

Darren Andrew Craig
FROST BROWN TODD LLC (Indianapolis)
dcraig@fbtlaw.com

Tristan Carl Fretwell
TAFT STETTINIUS & HOLLISTER LLP
tfretwell@taftlaw.com

Carly Jolene Tebelman
FROST BROWN TODD
ctebelman@fbtlaw.com

Adam Daniel Zacher
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
azacher@taftlaw.com